WILBUR (LOOMIS v.). See Case No. 8,498.

---

## Case No. 17,636.

### WILBUR v. STOCKHOLDERS.

[18 N. B. R. 178; 13 Phila. 479; 35 Leg. Int. 346; 26 Pittsb. Leg. J. 15.][1]

District Court, E. D. Pennsylvania. 1878.

CORPORATIONS — STOCK ASSESSMENTS — EQUITY POWERS — CONSTRUCTION OF CHARTER — BANKRUPTCY — ASSESSMENT BY ASSIGNEE — COUNTERCLAIMS — ULTRA VIRES — LIABILITY OF TRANSFEREES OF STOCK.

1. In the ordinary case of a solvent private corporation, there is no liability of the stockholders to pay the capital until an assessment, but in the case of insolvency, payment is compellable at the suit of the creditors, though no assessment may have been made.

2. Under proceedings in equity for this purpose, the court may, if a sufficient corporate organization continues to subsist, order an assessment by the corporate authorities upon the stockholders in any stage of the proceedings for any purpose for which it may be thought convenient. In such case it is only a proceeding in aid of the judicial recourse of the creditors; it may promote the enforcement, but is not essential to the existence of the obligation of the stockholders.

[Cited in Lane's Appeal, 105 Pa. St. 60.]

3. The bankrupt was a manufacturing company organized under a special act with a capital of fifty thousand dollars, divided into one thousand shares of fifty dollars each, with power to increase the number of shares to three thousand. The act prescribed no form or method of subscription to the stock, but authorized the payment of subscriptions in real or personal estate appropriate to the corporate business at a bona fide cash valuation, to be agreed upon by a majority in interest of the subscribers and

¹ [Reprinted from 18 N. B. R. 178, by permission. 26 Pittsb. Leg. J. 15, contains only a partial report.]

stockholders. It gave no authority to the directors or to any officer to accept payment for the stock except in money or money's worth. By the articles of association it was provided that the capital stock should be one hundred and forty thousand dollars, divided into two thousand eight hundred shares of fifty dollars each, and that the subscribers should give their notes, without interest, for the amounts subscribed by them respectively, which notes should not be liable, at any time, to an assessment for more than fifty per cent. of their face, nor to an assessment of more than twenty per cent. within eighteen months from the organization of the company. *Held*, that the true, legal, and only rational meaning of the provision was that, with ultimate relation to creditors, the capital was of the full residuary amount of one hundred and forty thousand dollars, but such calls for payments on the stock as might from time to time be made by the corporate authorities, in the course of the active business of the company, as a solvent concern, should not exceed one-half of that amount. There was nothing, therefore, in the articles of association to exempt or absolve stockholders from liability to creditors for so much of the whole capital of one hundred and forty thousand dollars as might be required for the payment of the debts.

4. Notes were given by most of the stockholders in payment for the stock subscribed for by them. Each of these notes conformed to the provisions of the articles of association, but contained a provision that all dividends should be credited proportionately upon it until its full amount, by reason of credits by assessments and dividends, should be paid, when the same should be returned and in lieu thereof a paid-up certificate of stock be issued. *Held*, that the operation of the articles of association as to creditors was not and could not be altered by the insertion of this provision in the notes.

5. The company having become bankrupt, and the deficiency of other assets exceeding the whole unpaid amount of the capital of one hundred and forty thousand dollars, *held*, that the stockholders were liable to the assignee in bankruptcy for their respective proportions of such unpaid amount.

6. Stockholders of an insolvent corporation who are also creditors, cannot be allowed to deduct the amount due to them from their respective proportions of the unpaid capital; but if they prove their debts under the bankruptcy, deductions equal to their estimated respective dividends may perhaps be made from the amounts of the assignee's demands against them as stockholders.

7. Where an investment in stock by a corporation was ultra vires the corporation will not be held liable as a stockholder.

8. A transferee of stock in a bankrupt company is liable to the assignee in bankruptcy in respect to such stock; but where the transfer was not accepted by the transferee, the transferer alone is liable.

W. D. Luckenbach and H. Green, for creditors.

P. K. Erdman, C. M. Runk, and R. E. Wright & Son, for stockholders.

CADWALADER, District Judge. The supreme court has described the capital of a private incorporated company as a fund publicly pledged to all who deal with the association. [Ogilvie v. Knox Ins. Co.] 22 How. [63 U. S.] 387. The application of the remark was to relations of the stockholders of such a company to its creditors. The stockholders individually are not liable

for its debts in any sum greater than their proportional amounts of the capital; and this limitation fortifies the reason that the creditors should be assured of an available recourse for so much of the capital as may be required for payment of the debts. Therefore a deceptive existence of a nominal or illusory capital, as distinguished from an actual and available one, cannot be sanctioned. The capital is a fund clothed with a trust for the security of the debts. Story, Eq. Jur. § 1252, cited [Curran v. State of Arkansas] 15 How. [56 U. S.] 307. So much of the capital as the stockholders have paid in is administered by the corporation; and if misapplied, or not rightly applied, the stockholders, unless willful participants in the wrong, are not responsible for it, or for any losses of creditors which it may cause. But even this immunity of the stockholders does not extend to capital paid in which has afterwards been paid back to them. They can, as against creditors, retain only the accrued profits, which, as contradistinguished from capital, have been actually earned and fairly distributed before insolvency. Capital paid back may, in the case of corporate insolvency, be followed by the creditors in the hands of the stockholders. Wood v. Dummer [Case No. 17,944]; [Curran v. State of Arkansas] 15 How. [56 U. S.] 307. 308.

The questions in the present case concern capital never paid in. The obligations, express or implied, of the stockholders to pay such capital are held by the corporation in trust for the ultimate security of its debts. [Upton v. Tribilcock] 91 U. S. 45; [Sanger v. Upton] Id. 56; [Webster v. Upton] Id. 60, 70, 71. Where the corporation is solvent, the unpaid capital is not due and payable by the stockholders until payment in part or in whole is called for by the corporate authorities, unless a postponement of the payment would be inconsistent with some provision of the act of incorporation, or with a conventional engagement with the stockholders. Ordinarily, there is no such inconsistency of either kind, and thus, in the case of a solvent corporation, a call or levy by the corporate authorities, assessing the amount or amounts payable, must ordinarily precede any ascertained obligation of the respective stockholders to pay. But in the contrary case of an insolvent corporation, the recourse of its creditors does not depend upon any such condition precedent, and cannot be thus postponed. Every stockholder is, with relation to creditors, under an obligation to pay so much of the amount represented by his share, or shares, of the capital, as may be required for payment of the corporate debts. Where he has made no express engagement, this obligation to pay is implied. Where an express engagement has been made upon such a condition as would impair the recourse of creditors, they may proceed as if no such conditional engagement had been made. Upon the insolvency of the corporation, the obligations of the stockholders thus at once become assets for the payment of its debts to such extent as other assets are deficient. To this extent the obligation of every stockholder, in its just proportion, then becomes in equity a debt payable for the benefit of the creditors. No act of the corporation, before or after its insolvency, can derogate, in this respect, from the rights of creditors. Neither can any omission of the corporation, or of the corporate authorities, exempt or absolve stockholders from this obligation. For example, there may not have been any call, or assessment of the contributory amounts of unpaid capital; or, where an assessment has been formally made, the corporation may not have taken measures, by suit, or otherwise, to compel defaulting stockholders to pay. Such omissions do not affect the equitable right of the creditors to payment. But there is no direct privity between them and the stockholders. The creditors therefore cannot, in their own names, sue the stockholders in a court of law, and may be unable, in such a court by mandamus or otherwise, to compel a private corporation either to make an assessment, or to institute suits to enforce one if made. See 1 Q. B. 288. But however such omissions may thus, for technical reasons, impede redress at law, they do not prevent or impede the available and complete recourse of the creditors in equity.

In a suit in equity by the creditors against the stockholders of an insolvent corporation to compel them to contribute a sufficient amount of unpaid capital to make good the deficiency of other assets, the corporation must of course be a party defendant. Such a suit is maintainable under several heads of equitable jurisdiction. The jurisdiction is exercisable in aid of the equitable rights of the creditors, who would otherwise have no adequate redress at law. It is also exercisable in order to enforce the due execution of the franchise of the corporation under the trust with which the capital is clothed for payment of the debts. The proceeding has been described by the supreme court as in the nature of an attachment in which the stockholders are called in to answer as garnishees. [Ogilvie v. Knox Ins. Co.] 22 How. [63 U. S.] 387. But in order to avoid circuity, the proceeding is also, on equitable principles, considered as a suit directly against the stockholders. They are thus, by the same court, assimilated in such a case to the special partners of a limited partnership. Id. This analogy implies that the stockholders become debtors through the mere insolvency of the corporation. In such a suit a receiver is ordinarily appointed. The amount of the deficiency, and amounts of the contributory quotas, may be ascertained by proofs, or through a reference and master's report, according to the course of procedure in equity: and there may thus be a final decree, affording adequate relief to the creditors, without any assessment by the corporate authorities. [Ogilvie v. Knox Ins.

Co.] 22 How. [63 U. S.] 380; 3 Comst. [3 N. Y.] 415, 423; 13 Wis. 57.

If a sufficient corporate organization continues to subsist, an assessment by the corporate authorities upon the stockholders may be ordered by the court of equity in any stage of the proceedings for any purpose for which it may be thought convenient. But in such cases the assessment, so called, is different in its nature from the assessments by a solvent corporation. The consideration of this difference in the applications of the word "assessment" will become very important hereafter. In the meantime it may be observed that in the case of an insolvent corporation, the assessment, if judicially ordered, is only a proceeding in aid of the judicial recourse of the creditors. It may promote the enforcement, but is not essential to the existence, of the obligation of the stockholders. Thus Judge Treat was of opinion that where "a company is insolvent, the original mode of making calls upon the stockholders is not to be pursued in the enforcement of" the equitable right. He said: "The debt is then due on demand." Myers v. Seeley [Case No. 9,994]. In a previous case in Ohio the language used was that where a company "becoming insolvent abandon all action under their charter, the original mode of making calls upon their stockholders cannot be pursued. The debt, therefore, from that time must be treated as due without further demand." 17 Ohio, 191. This case was cited by the supreme court of the United States in [Sanger v. Upton] 91 U. S. 60, 61. In these three cases, the comments on the subject were very much alike, to the effect that "no stockholder could shelter himself behind an agreement that he might pay otherwise than in money or money value," and that if, as between the corporation and the stockholders, there might be an agreement to pay in some other medium, "neither directors, nor stockholders, nor both," could so act towards creditors as to debar them from insisting upon actual payment in money.

More than two centuries ago, a decision of the house of lords, on an appeal from the court of chancery, established the competency of equitable jurisdiction under a creditor's bill against an insolvent trading corporation and the stockholders; and established the existence of an incidental judicial power to direct the levying of an assessment by the corporate authorities upon the stockholders. But, in the same case, the ultimate decision indicated that there was no necessity for such an assessment where the bill was taken as confessed, or the debt and contributory amounts were otherwise ascertained. The suit was in equity only. There was neither a previous, nor a subsequent action at law. The court of chancery, on a demurrer by the stockholders, decreed that the bill be dismissed. The court of appeal reversed this decree, overruled the demurrer, and remitted the cause to the court of chancery with a provisional order for an assessment. But, as the defendants did not appear and answer, the bill was taken pro confesso; and the assessment does not appear to have been thought necessary. It probably never was made. The ultimate decree was a direct one that the defendants pay what was due. Salmon v. Hamborough Co., 1 Cas. Ch. 204, 208, abridged in 6 Vin. Abr. 310, 311, and cited by the supreme court in [Sanger v. Upton] 91 U. S. 61.

In many cases of corporations adjudged bankrupt under the recent bankrupt law of the United States [14 Stat. 517], the court of bankruptcy has made such an assessment. It is, to the extent of the unpaid capital, binding upon the stockholders, who may afterwards be severally sued at law by the assignee for the respective contributory quotas. This course of proceeding by the assignee, though circuitous, and sometimes requiring a multiplicity of suits, has been thought more convenient, in most cases, than a bill in equity, or a summary suit of that nature in bankruptcy against the stockholders, because, in such a proceeding, they must all be defendants. But where they can all be conveniently served with process, whether it be a subpoena in equity, or a citation in bankruptcy, this objection does not apply; and the supreme court has said that "the assignee might have filed a bill against all the delinquent shareholders." [Sanger v. Upton] 91 U. S. 62. Where the capital is of a certain amount, to which it was either originally limited, or has been increased by an unconditional exercise of competent authority, the propositions above stated as to rights and remedies of creditors apply without exception or qualification. Therefore, if an optional increase of unpaid capital has been effected unconditionally, the corporation or corporate authorities cannot afterwards, with relation to creditors, by any act or omission, exonerate the stockholders from their obligation to pay the increased amount, or, in any wise qualify the obligation. This was, in effect, decided in Chubb v. Upton, 95 U. S. 665.

A question which may here be suggested is, whether, at the time of an authorized increase of unpaid capital, a condition which could not afterwards be imposed may not, under possible circumstances, be reasonably annexed to such increase by the same competent authority which creates it. Effectual arrangements of this kind may be conventionally made between the stockholders and the corporation, or by the stockholders mutually with one another. But arrangements thus valid and binding in those relations might be invalid with relation to creditors. The point is whether such a condition can be valid in any case with relation to creditors. This question cannot arise except as to some part of the capital of which the creation is wholly optional with the corporation. Nor can the proposition be affirmed unless with a limited application regulated so as to preclude any possibility that creditors may be misled by a fictitious or illusory increase of the capital. Under this restriction, and perhaps others, the proposition may, in the abstract, be affirmed. The respondents contend that it is applicable in the present case to a certain part of the capital of the bankrupt corporation. They are

the stockholders, and the petitioner is the assignee of this corporation. It was a manufacturing company created by an act of the legislature of Pennsylvania of the 16th of March, 1865 (Pamph. Laws, p. 387), with a capital stock divided into shares of fifty dollars each, to consist of one thousand shares with power to increase the number of shares to three thousand. The minimum of legislatively authorized capital was thus fifty thousand dollars, and the maximum one hundred and fifty thousand dollars. Any addition to the minimum was optional, but was to be in shares of fifty dollars each. No form or method of subscription of the minimum, or of any increased amount, was prescribed. This legislative omission distinguishes the case from some of those which have been cited in the argument. The act of incorporation authorized the payment of subscriptions of stock in real or personal estate appropriate to the corporate business, at a bona fide cash valuation to be agreed upon by a majority in interest of the subscribers and stockholders. This impliedly prohibited payment of the capital otherwise than in money, or money's worth. But though the act had contained nothing on the subject of the medium of payment, contributions to the payment of capital otherwise than in money or money's worth could not have been rightfully accepted by the corporation. The act provided that the affairs of the company should be managed by a board of directors, one of whom should be the president, who should be chosen by the stockholders. But no power was expressly given to the directors, or to any officer, to accept payment of the capital, or of any part of it, otherwise than in money. What might, in this respect, have been the implied administrative power of the directors, if no authority over the subject had been expressly conferred upon the stockholders duly assembled, is a question which it will not become necessary to consider. It may, however, become important hereafter to recollect that the act, as above quoted, expressly required a vote of the stockholders to sanction the acceptance of a payment even in real or personal estate, appropriate to the corporate business; that no power, absolute or qualified, was vested in the directors or officers to accept such a payment; and that they could acquire no such power, unless it were delegated by a vote of the stockholders. Whether it could be thus delegated is a question which will not arise. The act did not, otherwise than as has been mentioned, prescribe any method of corporate organization, but provided that the first election of the directors and president should be held within sixty days after the act should take effect, and gave the "privilege to commence operations" when five thousand dollars of the capital should be subscribed and paid in. Large powers of borrowing and issuing securities for money borrowed were also conferred. But more than five years elapsed before anything was done, formally, with a

view to a commencement of the corporate business. Whether the organization was too late, or was otherwise irregular, are immaterial questions. Objections of this kind cannot be suggested in a proceeding between the present parties. See Chubb v. Upton, 95 U. S. 665; also [Minor v. Mechanics' Bank of Alexandria] 1 Pet. [26 U. S.] 46, 63, 65.

On the 23d of July, 1870, there was a meeting of the shareholders, who subscribed articles of association, and elected officers and directors. The articles of association were subscribed by all of the shareholders on that day, or, at the latest before the end of July, 1870. These articles have been called a "subscription list." But this name applies very imperfectly. They constituted, so far as the amount of capital, and the rights of creditors with relation to it, might be concerned, a fundamental conventional organization of the company, which was irrevocable. The leading provision of these articles of association was, that the capital should be one hundred and forty thousand dollars, divided into two thousand eight hundred shares of fifty dollars each, and that the subscribers should give their notes, without interest, for the amounts subscribed by them, respectively, which notes should not be liable, at any time, to an assessment for more than fifty per cent. of their face, nor to an assessment of more than twenty per cent., within eighteen months after the organization of the company. According to this provision of these articles, the company was to have a certain capital, of which one-half was never to be liable to assessment. How ought the phrase "liable to assessment," as here used, to be understood and applied? Did it mean that this half of the capital should not, in any possible event, become payable? If so, the provision was self-contradictory, and absurd, if not fraudulent. It would then import that the capital should be one hundred and forty thousand dollars in two thousand eight hundred shares of fifty dollars each, but that seventy thousand dollars of the amount, or twenty-five dollars of each share, should not become payable even in the event of the company's insolvency, and a failure of other assets. This seventy thousand dollars would not, in that case, be a part of the capital for any purpose whatever, and one thousand four hundred shares would not be shares of fifty dollars each. But no such absurd meaning is attributable. The true legal and only rational meaning of the provision was that, with ultimate relation to creditors, the capital was of the full residuary amount of one hundred and forty thousand dollars, but such calls for payments on the stock as might from time to time be made by the corporate authorities, in the course of the active business of the company as a solvent concern, should not exceed one-half of that amount.

The intended application of the provision clearly was to capital requiring an assess-

ment in order to make it payable. The difference, in this respect, between a solvent and an insolvent corporation has been explained. We have seen that, as a corporation is solvent or insolvent, the nature. purposes. and effect of what is called an "assessment" differ widely. and that, in the ordinary case of a solvent private corporation, there is no liability of the stockholders to pay the capital until an assessment, but that in the case of insolvency, payment by them is compellable, at the suit of the creditors, though there may not have been any assessment. The provision in question was applicable only to assessment in the primary sense of the word. The limitation of liability to assessment therefore applied only between the corporation and the stockholders. or to the stockholders among themselves, and did not, in any wise, affect rights of creditors. That no other intent is rationally imputable appears, also, when we consider that not more than twenty-eight thousand dollars (that is to say, twenty per cent. of the whole conventionally increased capital of one hundred and forty thousand dollars) was, according to this provision of the articles, to be liable to assessment for the period of eighteen months. But the minimum amount of legislatively authorized capital was fifty thousand dollars. Therefore, twenty-two thousand dollars of minimum was to be exempt from liability to assessment for this period. Such a conventional postponement of payment might be fair and honest. as between the corporation and the stockholders, or as to the stockholders among themselves. But it could not, even according to the respondent's own theory of the present case. be pretended that this twenty-two thousand dollars, or any other part of the minimum amount of the statutory capital, could be put by them beyond the reach of creditors for eighteen months. Yet this would be the effect of the articles, if the phrase "liable to assessment," as used in them, were understood as intended to affect creditors in any event.

For these reasons there was nothing in the articles of association of July, 1870. to exempt or absolve stockholders from liability to creditors for so much of the whole capital of one hundred and forty thousand dollars as might be required for payment of the debts. The stockholders would have been liable for no less an amount if they had severally given their notes in the form stipulated in the same articles, and would, under those articles, have been liable for no less, though no such notes were given.

The question remaining for consideration arises from the fact that notes of stockholders were afterwards given and received which differed materially from such as were stipulated for. Subjoined to the articles were two parallel columns, opposite to the respective signatures. In one of these columns the number of shares of each stockholder was set down. This column appears to have been filled up in July. 1870, when

the articles were subscribed. The other column, headed "Amount of Stock Note Given," seems not to have been filled up until afterwards, at the several times when the respective notes were given. But these times are not entered in the column. No note appears to have been given by any stockholder in July, 1870, when the articles of association were definitely agreed upon and subscribed. At different times, in and after August, 1870, notes. called "stock notes" or "subscription notes," all dated on the first of that month, were signed by forty-two of the shareholders. There were five other shareholders, none of whom gave any note. Every note given was for the full amount of fifty dollars for each share taken by the subscriber, payable one day after date, without interest, and subject to such assessments, from time to time, as the board of directors might deem necessary, provided that such assessments should not exceed fifty per cent. of the face of the note, nor exceed twenty per cent. thereof within eighteen months from its date. and that all assessments made and paid should be credited thereon. Thus far the notes were substantially conformable to the stipulation for them in the articles. But every note contained the additional provision that in the event of the company declaring any dividend, or dividends, out of profits made, the same should be credited on the note, in the proportion to which the number of shares of the capital stock standing in the subscriber's name might entitle him, until the full amount of the note, by reason of credits by assessments and dividends, should be paid, when the same should be returned to him, and in lieu thereof a paid-up certificate of stock be issued. As to that half of the capital stock of one hundred and forty thousand dollars which was payable in actual money whenever called for, these notes thus repeated the provisions of the articles of association. The provision of those articles, that the other half should not be liable to assessment, was also repeated in words, but with a different context. The superadded provision changed their meaning. The import, thus altered, was. according to the notes, that the latter half of the capital should not be payable otherwise than out of a contingent fund composed of the profits, if there should be any, of the company's future business; and this contingent fund was appropriated for the payment of any capital otherwise deficient. Therefore, no dividends of profits were to be distributable until after such payment, but all profits which might be earned were to be reserved as applicable to such payment, until the whole nominal capital should be accumulated and paid. If the superadded provision had been contained in the articles of association, or had been stipulated for in them, as an intended provision of the notes which were to be given. the question of the effect of the arrangement,

as a whole, with relation to creditors, would have been a very interesting one, however it might be decided. It was contended for the assignee that any appropriation of contingent profits otherwise than for payment of the debts would be fraudulent with relation to creditors. But the answer to this argument is that actual profits might, in the absence of any appropriation of them, be distributed as dividends among the stockholders, and therefore an appropriation preventing such a withdrawal of profits could not be fraudulent. If, in the result, seventy thousand dollars, actually earned as profits, had been conventionally obtained as capital, it would be difficult to distinguish this from any other mode of payment in money, or money's worth. The common stock of an unincorporated partnership may certainly be increased by a conventional conversion of accrued profits into capital which cannot be drawn out for individual use. In such a supposable case, whether of a corporate or an unincorporated association, when the profits are already accrued and in hand, the means of payment are no longer contingent. In the present case, however, no profit was ever made or declared as a dividend or otherwise; nor was a certificate of stock, in any form, ever issued. The question concerns a contingent or conditional increase of capital.

The act of incorporation did not absolutely require a capital of more than fifty thousand dollars. Any excess of capital above that amount being optional, might never have been created. The argument for the respondents, therefore, is, that the excess, if created, might have been created either absolutely or upon any reasonable condition or contingency. The seventy thousand dollars, payable in actual money, though one-half only of the conventionally increased capital, was more than the fifty thousand dollars absolutely required by the act. The other half of the conventional capital, it is contended, might reasonably, therefore, be made payable on the contingency that there should be a sufficient amount of actual profits of the company's business.

It will not be necessary to decide the point, because the operation of the articles of association as to creditors was not and could not be altered by the insertion of the superadded provision in the notes. There was nothing in the articles, or in any proceedings of the stockholders, when the articles were subscribed, to indicate that the notes might contain any such additional matter. Even as between the corporation and a stockholder, the insertion of the provision in his note would, without his concurrence, have been an unauthorized interpolation. This will appear when we consider the subject with reference to any one of the five stockholders who never gave notes. If he refused to give such a note as the articles of association had stipulated for, he would have been liable to an action at the suit of the corporation for not giving it. See 4 East. 147; 3 Bos. & P. 582. But if he had offered to subscribe a note conformable to the stipulation in those articles, and the company had refused it, and required a note containing the superadded provision, the action would not have been maintainable. For payment of one-half of the capital, the purport of the provision was to authorize a withholding and retention of the profits. Assuming that this might originally have been authorized, it would have required the sanction of a vote of the stockholders, duly convened at a corporate meeting. Independently of special provisions of the act of incorporation, such a sanction would have been required on general principles of the law of corporations. Now, the stockholders were never assembled after they had originally subscribed the articles of association in July, 1870; and even if they had been so assembled, they could not, as to creditors, have annulled or varied anything in those articles. The creditors of a corporation must, indeed, take cognizance of its organization. But the organization was here effected by the articles which ascertained irrevocably the rights of creditors with relation to the capital. The subsequent taking of the notes was a matter of administration, which, if the notes had been conformable to the articles, would have been in aid of the organization. but even then would not have been a part of it. As the giving of notes was, however, stipulated for in the articles, the stockholders invoke the rule of interpretation that a recital or mention of one writing in another is constructive notice of the contents of the one recited or mentioned. But this rule cannot here apply so as to affect the creditors. In any stipulation for notes in the articles, the intended contents of the notes ought to have been set forth fully. The stipulation here purported to do so. There was therefore nothing in the articles to induce a creditor to desire to see the notes, or even to induce him to inquire whether they were given.

Another ordinary rule of interpretation is that where several writings have been executed between the same parties, or those respectively in privity with them, on the same subject or business, the writings are considered as if they together constituted one and the same instrument. It is therefore urged for the respondents that the articles of association and the notes are to be read together, as if the superadded provision of the notes had been contained in the articles. There is no doubt that the notes should be interpreted with reference to the articles. Thus far the rule applies. But the question is whether it applies conversely, so that the interpretation of the prior articles depended upon the contents of the subsequent notes where they differ. It is not always essential to the application of the rule that the writings bear the same date, or have been executed at the same instant of time. The rule may apply to any series of acts fairly executed with a common intent. And so far as they are dependent upon one another, a subsequent act may sometimes indicate the meaning of a prior one. But where the prior act was absolutely

or relatively independent of the subsequent one, the rule cannot apply to the former so far as it was independent. Nor can the rule apply so as to sanction a usurpation of authority by the latter act. Here the notes were dependent upon the articles. But we have seen that there was no converse dependence of the articles upon the notes, and that no existing authority enabled any parties, after the execution of the articles, to affect rights of creditors by such a provision as was interpolated in the notes.

A consideration of less weight, but perhaps not wholly unimportant, is that there does not appear to have been any permanent memorial of the provision in question. The stock ledger stated the amounts, but did not indicate the form or contents of the notes. The only evidence of an arrangement postponing the payment of one-half of the capital until after a sufficient accumulation of profits was in the notes themselves. This was fugitive evidence, not only for general reasons, but also because it was expressly provided in each note that the note should be surrendered so soon as paid through the limited assessments and the accumulated profits. A paid-up certificate of stock was then to be substituted. After such hoped for extinction and surrender of the notes, no evidence of the former arrangement would, so far as appears, have been extant among the papers or in the books of the company. This might be unimportant if the taking of the notes had been only a matter of administration between the corporate authorities and the stockholders. But if the provision so concerned the corporate organization as might affect the source and amount of the capital with relation to creditors, more enduring evidence of the arrangement in its original form would probably have existed.

Much of the above reasoning might have been out of place if the conventional corporate organization had not been originally effected through the articles of association subscribed by the same parties who afterwards gave the notes. Had there been no such previous articles, the organization itself might have depended more or less, if not altogether, upon the notes. The reasoning might also have been more or less qualified, if the stipulation for notes in the articles had not described the intended notes with sufficient fulness and particularity, but had, in this respect, been ambiguous or obscure. There is no such difficulty of either kind; and it follows that the rights of the creditors are definable with a sole reference to the act of incorporation and the articles of association, according to which the capital was one hundred and forty thousand dollars, without any diminution with relation to creditors. On the 28th of July, 1870, after the adoption of the articles of association, and before the date of the notes, the directors met and assessed two instalments of ten per cent. each on the capital stock. One of them was payable on the 1st of September, and the other on the 1st of November, 1870. Both instalments were paid, except that one holder of fifteen shares paid only the first instalment, leaving the second seventy-five dollars unpaid. The amounts paid by all the stockholders were thus, together, twenty-seven thousand nine hundred and twenty-five dollars, as on assessments of twenty-eight thousand dollars, and as twenty per cent. of a capital of one hundred and forty thousand dollars. Beyond these two instalments, together twenty per cent., no part of the capital was ever paid. On the 3d of September, 1874, the directors imposed an additional assessment of thirty per cent., payable by certain instalments. But the resolution imposing it was rescinded on the 1st of December, 1874. At about this time, the business of the company was closed by reason of insolvency, and in the spring of 1875 the company was adjudged bankrupt, owing one hundred and seventy-six thousand four hundred and thirty-four dollars, with available assets to the amount of only four hundred and twenty-nine dollars. The deficiency, one hundred and seventy-six thousand dollars, was thus much greater than the whole unpaid capital, at whatever amount computable. If the whole capital was one hundred and forty thousand dollars, the amount unpaid was one hundred and twelve thousand and seventy-five dollars. This unpaid amount is demanded by the assignee in bankruptcy, as payable proportionally by the respective stockholders, respondents. They admit that they are liable for their respective proportions of forty-two thousand and seventy-five dollars, which is all that remains unpaid of the minimum amount of legislatively authorized capital. But they dispute their liability for the seventy thousand dollars, which is the excess above that minimum. In the course of this opinion, the objections to their liability have been considered and overruled.

The proceeding is a petition of the nature of a bill in equity, under the summary jurisdiction of the court of bankruptcy. All the stockholders are defendants, and all of them have appeared and answered. The case was referred to a register, to take examinations and proofs, and report specially on certain points. His report is, in effect, an assessment of the whole of the unpaid part of the capital of one hundred and forty thousand dollars upon the stockholders, by name, with a statement of the respective contributory quotas. This report is confirmed. Its confirmation is an assessment by the court, so far as it may be necessary. But as the insolvency is admitted to be total and absolute, the decree will be directly against the several stockholders for the respective amounts of their contributory quotas, which are sufficiently ascertained in the register's report. The several amounts admitted to be due will be payable in two months, and

the excess in four months. For one-half of the latter amount, there may be a further extension of two months to any respondent who may give sufficient security. Every party will pay his own costs, those of the assignee to be reimbursed out of the estate in bankruptcy.

Certain cases of individual stockholders require special consideration.

The first is the case of J. W. Wilson, the late president of the bankrupt company. In the articles of association, the stockholders agreed to purchase, for corporate use, the real and personal estate of a former corporation, at a price equal to that former company's debts. This was, I think, a legally authorized purchase. It was effected, and notes of the bankrupt company, for the price, were given to the creditors of the former corporation. At a meeting of the directors of the bankrupt company, on the 5th of September, 1870, it was resolved that Mr. Wilson, the president of this company, endorse extension notes, to be given to those creditors, and that the company would hold him harmless against loss, by reason of those endorsements, and to that end pledged thirty per cent. of the subscription notes to their capital stock. To the amount of eight thousand six hundred and ninety-five dollars and fifty-five cents, the extension notes have never been paid by this company. Whether Mr. Wilson has paid them does not appear. But he has never been indemnified against his endorsement of them, or secured otherwise than by the resolution of the 5th of September, 1870. He is entitled to the benefit of the security, according to its substantial intent. An interlocutory order to this effect was made in an early stage of the proceedings, with liberty to either party to move for further directions. It now appears that he is a stockholder of the bankrupt company, on a subscription for five thousand dollars, upon which his unpaid contributory quota is four thousand dollars. His case, unless amicably settled, may be referred to the register, with directions to adjust and state his account as to these matters, and other dependencies with him, if there be any.

As to the Wyoming Coal and Transportation Company, one of the alleged stockholders, the petition of the assignee is dismissed, but without costs. The investment by or on behalf of that company was beyond its corporate powers. The argument for the assignee upon the distinction between executory and executed contracts does not apply to the case, except so far as it may perhaps preclude this Wyoming Company from getting back the amounts of assessments paid, or from proving for them. Under the peculiar circumstances of the case, I do not consider the officer of the same company who made the subscription responsible personally. It was seasonably ratified by that company so far as its powers extended. The petition is also therefore dismissed as to him, but without costs.

The set-offs claimed by certain stockholders who allege that they are creditors of the bankrupt corporation cannot be allowed as deductions from the respective amounts of unpaid capital. To allow such deductions would, in effect, give to creditors who are also stockholders a preference over the other creditors in bankruptcy. But if the creditors who are also stockholders prove their debts under the bankruptcy, deductions equal to their estimated respective dividends may, perhaps, be made from the amounts of the assignee's demands against them respectively as stockholders. The register is authorized to make and report, as occasion may arise, the approximate estimates for such deductions on equitable principles. Such estimates and reports may be made after the general decree for the full respective amounts of unpaid capital.

The attachment executions which were prior to the commencement of the proceedings in bankruptcy cannot prevent the entering of the decree, or prevent its enforcement. But the decree will be made without prejudice to the rights, if any, of the respective attaching creditors; and each one may, if so advised, intervene for his own interests.

The Lehigh Valley Iron Company was not an original stockholder, but holds fifty shares, under a transfer made by an original stockholder. The transfer was made and accepted for a purpose incidental to the business of this company, and the acceptance cannot be considered beyond its corporate powers. On the question whether a transferee of stock in the bankrupt company is liable to the present demand of the assignee, all the decisions in several states of the Union cannot be reconciled. If the preponderance of authority were doubtful, it would be determined on the affirmative side of the question by the opinions of the supreme court of the United States, in [Sanger v. Upton] 91 U. S. 65, and the English court of king's bench, in 7 Term R. 36, 46. In Pennsylvania, if the point has never been decided affirmatively in the case of a corporation chartered by her own legislature, the preponderance of authority is on the same side. The cases of Trevor v. Perkins, 5 Whart. 244, and Merrimac Min. Co. v. Levy, 4 P. F. Smith [54 Pa. St.] 227. show this; and there is nothing decided to the contrary in West Philadelphia Canal Co. v. Innes, 3 Whart. 198. If the cases of Canal Co. v. Sansom, 1 Bin. 70, and Palmer v. Ridge Min. Co., 10 Casey [34 Pa. St.] 288, are not overruled on this point, their authority upon it is now limited, so that they apply only where a corporation is authorized, by its charter, to forfeit the stock of a delinquent shareholder for non-payment of dues. The present is not such a case, and any doubt from these two decisions, which might otherwise have

arisen, is removed by the remarks upon them in 4 P. F. Smith [54 Pa. St.] 229, 230, and [Webster v. Upton] 91 U. S. 70. The decree must, therefore, be against the Lehigh Valley Iron Company, on the same footing as against the original subscribers.

A like effect is attributable to the transfer of Dewees J. Martin's stock to Dr. E. G. Martin. If this transfer had been a recent one, and had been either simply to secure a debt, or upon trust for the general benefit of creditors, Dr. Martin would perhaps have been entitled in equity to elect whether to accept or to reject the stock; and if he had, after the death of D. J. Martin, acquired it as administrator, he might have held it in the representative capacity only. But the evidence does not sufficiently establish his allegations; and his delays and omissions have been such that the decree must be against him, as if he had, in 1872, been the acceptor of an absolute transfer.

Levi Line transferred his one hundred and thirty-five shares to C. H. Nimson. But Nimson did not accept the transfer. Line, therefore, and not Nimson, is liable in respect of these shares. But Nimson, as to fifty other shares, is liable as an original subscriber.

Willoughby Fogel subscribed the articles of association, but died before giving any subscription note. The subscription note was given by his widow, Maria Fogel. The register appears to have considered her the proper party against whom payment should be decreed. It may be proper that counsel be heard again as to this case, if it is of practical importance to determine whether the liability is that of her deceased husband's estate.